IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


GEORGE HICKS,

        Plaintiff,

vs.                                                          CASE NO. 1:10-cv-15-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") terminating his disability insurance benefits due to medical improvement.  (Doc. 1.)  The Commissioner has answered (Doc. 16), and both parties have filed briefs outlining their respective positions.  (Docs. 22 and 26.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act") on December 27, 1993 alleging a disability onset date of March 17, 1986.  (R. 12.)  Following initial denials and an administrative hearing on June 9, 1995, administrative law judge ("ALJ") Emanuel Tannenbaum issued a decision on June 26, 1995, finding that Plaintiff was disabled as of March 17, 1986 due to failed back syndrome, chronic back pain syndrome, and major depression.

(R. 29-36.)

A continuing disability review of Plaintiff's case was initiated in August 2001 and Plaintiff's benefits were terminated effective January 1, 2002 due to medical improvement related to his ability to work.  (R. 12, 287-89, 355-56, 503.)  Plaintiff filed a request for reconsideration, which was also denied. (R. 290-91, 303-10, 358.)  Plaintiff then timely filed a request for a hearing and appeared and testified at a hearing held on September 10, 2004.  (R. 12, 312-13, 480-99.)  In a decision dated February 3, 2005, ALJ Charles D. Romo upheld the Commissioner's determination that Plaintiff's disability ceased on January 1, 2002 due to medical improvement related to his ability to work. (R. 12-23.)  Plaintiff then timely requested review of ALJ Romo's decision by the Appeals Council and the Appeals Council denied Plaintiff's request for review on June 2, 2007.  (R. 5-9.)

Following the denial of Plaintiff's request for review by the Appeals Council, Plaintiff filed a Complaint in this Court on August 1, 2007 in Case No. 1:07-cv-143-MP-AK.  (1:07-cv-143-MP-AK Doc. 1.)  On February 3, 2009, a Report and Recommendation was issued recommending that the Commissioner's decision be reversed and remanded to (i) give greater weight to the medical opinion expressed by treating physician Dr. Oscar Depaz and (ii) to elicit the testimony of a vocational expert to consider what jobs Plaintiff can perform with his nonexertional limitations of pain and mental illness.  (1:07-cv-143-MP-AK Doc. 24; R. 549-69.)  In a March 5, 2009 order, this Court then remanded this case to the Commissioner. (1:07-cv-143-MP-AK Doc. 25; R. 547-49.)  The Appeals Council then remanded this case to an ALJ for further proceedings consistent with the Court's March 5, 2009 order.  (R. 570-72.)   Plaintiff

appeared and testified at a hearing held on August 13, 2009 and ALJ Apolo Garcia issued a decision on October 22, 2009 in which he concluded that Plaintiff's disability had ceased on January 1, 2002 due to medical improvement. (R. 503-12, 602-29.) Plaintiff then filed his Complaint in this case on January 28, 2010.  (Doc. 1.)

## II.  CONTINUING DISABILITY STANDARD OF REVIEW

This case does not involve the review of an initial application for disability benefits, but rather a review of Plaintiff's continuing disability in order to determine if he remains eligible to receive benefits. In determining whether a claimant's disability continues or ends, the Commissioner must determine whether there has been any medical improvement in the claimant's impairment(s) and, if so, whether the medical improvement is related to the claimant's ability to work.[1]  In determining whether medical improvement has occurred the Commissioner will compare the medical severity of the Plaintiff's impairment(s) at the time of the decision to continue or discontinue benefits to the medical severity of the impairment(s) when benefits were awarded.[2]

Medical improvement is defined as any decrease in the medical severity of the claimant's impairment(s) that was present at the time of the most recent favorable medical decision that the claimant was disabled.[3]  This most recent favorable medical decision that the claimant was disabled is known as the comparison point decision

---

[1] 20 C.F.R. § 404.1594(a). The definitions and evaluation process governing disability determinations for disability insurance benefits under Title II of the Social Security Act are identical to those governing benefits under supplemental security income, Title XVI of the Act. *See* 20 C.F.R. § 416.101, *et seq.*

[2] 20 C.F.R. § 404.1594(b)(7).

[3] 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(I).

("CPD").[4]  A finding of a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with the claimant's impairment(s).[5]  Symptoms are the claimant's description of the impairment(s).[6]  Signs are abnormalities which can be observed and must be shown by medically acceptable clinical diagnostic techniques.[7]  Laboratory findings are findings produced by medically acceptable laboratory techniques.[8]  Medical improvement is related to the claimant's ability to do work if there has been a decrease in the severity of the impairment(s) present at the time of the most recent favorable medical decision that the claimant was disabled and an increase in the claimant's functional capacity to do basic work activities.[9]  Section 404.1594(f) of the Code of Federal Regulations outlines the evaluation steps to be taken in reviewing whether a claimant's disability continues. These steps are:

>(1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant's disability status will cease.

>(2) If no, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 [of the regulations]?

>(3) If no, has there been medical improvement in the claimant's condition?  If yes, proceed to Step 4.  If no, the claimant's disability continues.

---

[4] 20 C.F.R. § 404.1594(b)(7).

[5] *Id*.

[6] 20 C.F.R. §§ 416.928(a), 404.1528(a).

[7] 20 C.F.R. §§ 416.928(b), 404.1528(b).

[8] 20 C.F.R. §§ 416.928(c), 404.1528(c).

[9] 20 C.F.R. § 404.1594(b)(3).

(4) Is the medical improvement in the claimant's condition related to his ability to work?  If no, proceed to Step 5.  If yes, proceed to Step 6.

(5) If the medical improvement in the claimant's condition is not related to his ability to work, do any of the exceptions[10] listed apply?  If no, the claimant's disability continues.

(6) If the medical improvement is found to be related to the claimant's ability to work, the Commissioner will determine whether all of the claimant's current impairments, in combination, are severe.

(7) If these impairments are severe, the Commissioner will assess the claimant's residual functional capacity to determine whether the claimant can perform his past relevant work.  If the Commissioner determines that the claimant can perform his past relevant work, his disability status will cease.

(8) If the claimant can no longer perform his past relevant work, the Commissioner will assess whether the claimant can do other work considering the claimant's residual functional capacity, age, education and past work experience.  If he can, his disability status will cease.

In the case of a determination as to continuing disability, the court must review the Commissioner's final decision in terms of both the eight-step analysis outlined above and the general substantial evidence standard of review.  Therefore, the appropriate inquiry is "whether the [Commissioner]'s finding of improvement to the point of no disability is supported by substantial evidence."[11]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person

_____

[10] If a claimant meets any of the following exceptions, even if medical improvement has not occurred, the individual can still be found capable of substantial gainful activity if:

      (1) The claimant was the beneficiary of advances in medical or vocational therapy or technology (related to the claimant's ability to work).

      (2) The claimant has undergone vocational therapy related to his or her ability to work.

      (3) Based on new or improved diagnostic or evaluative techniques, claimant's impairment(s) is/are not as disabling as was thought at the time of the most recent favorable decision.

      (4) Substantial evidence demonstrates that any prior disability decision was in error.

[11] Simpson v. Schweiker, 691 F.2d 966, 969 (11th Cir. 1982); see also 42 U.S.C. § 405(g).

would accept as adequate to support the conclusion.[12]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[13]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[14] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[15]

### III.  SUMMARY OF THE RECORD

The Plaintiff's challenge to the Commissioner's decision focuses upon ALJ Garcia's treatment of the medical opinions expressed by Dr. Oscar Depaz as well as ALJ Garcia's use of a hypothetical question containing a vocational profile Plaintiff contends was inconsistent with Plaintiff's limitations as expressed in Dr. Depaz's opinion.  Therefore, the Court will focus its discussion of the record on those issues.

### A.    Personal Background

Plaintiff was born on September 24, 1959, which made him 49 years old as of

---

[12] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)(citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401 (1971))); accord Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[13] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[14] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)(holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[15] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

his August 13, 2009 administrative hearing before ALJ Garcia.  (R. 13, 21, 626.)
Plaintiff has a twelfth grade education and his past work experience includes stints as
an operating room technician/orderly, laborer and cook.  (*Id.*)

**B.**     **The Comparison Point Decision**

Plaintiff was deemed disabled as of March 12, 1986 in a decision dated June 26,
1995 by ALJ Emanuel Tannenbaum.  (R. 29-36.)  ALJ Tannenbaum concluded that
Plaintiff had the severe impairments of failed back syndrome post status four back
surgeries, chronic back pain syndrome and major depression with psychosis.  (R. 32.)
ALJ Tannenbaum also concluded that Plaintiff's subjective description of his limitations
was consistent with the medical evidence in the record.  (*Id.*)  With respect to Plaintiff's
RFC, ALJ Tannenbaum concluded that Plaintiff's impairments would prevent him from
more than minimal standing, walking, sitting, lifting, pushing, pulling; operating foot
controls; maintaining attention and concentration for extended periods; or performing
any type of work activity, even at the sedentary level, on a sustained basis.  (R. 31.)
Based upon this RFC, ALJ Tannenbaum concluded that Plaintiff could not perform his
past relevant work and that there were no jobs existing in significant numbers in the
national economy that Plaintiff could perform.  (R. 30.)  Accordingly, he concluded that
Plaintiff had been under a disability as of March 17, 1986.  (*Id.*)

**C.**     **Evidence Considered By ALJ Garcia**

The majority of the medical evidence considered by ALJ Garcia consisted of
Plaintiff's medical records from his visits to several treating physicians.  Several
consulting physicians and psychologists also completed physical residual functional

capacity assessments and mental status assessments of Plaintiff which ALJ Garcia also relied upon.  The Court will discuss each source in turn.

### 1.    Medical Records

On November 2, 1998 Dr. Gary Lowery, M.D., Ph.D. of the Florida Neck and Back Institute in Gainesville examined Plaintiff and noted that Plaintiff's symptomatology was improving and that Plaintiff's activity tolerance had increased, as Plaintiff was walking about a mile a day as well as doing home exercises.  (R. 390.)

Plaintiff first visited Dr. Oscar Depaz, M.D. of Rehabilitation Medicine Associates in Gainesville on June 24, 1999 for treatment of his neck and back pain.  (R. 387.) Plaintiff reported to Dr. Depaz that he was a passenger in a car that had been rear-ended on April 23, 1999.  (*Id.*)  Dr. Depaz noted that Plaintiff's range of motion in the cervical spine was markedly limited and that Plaintiff held his cervical spine very stiff in a forward-projected manner.  (*Id.*)  An MRI of Plaintiff's cervical spine performed on July 2, 1999 reflected that at C4-C5 Plaintiff had a left paramedian disc protrusion resulting in mild-moderate left sided canal stenosis with mild impression of the left side of the spinal cord as well as minimal spondylostenosis at C3-C4 without foraminal stenosis or nerve root compression.  (R. 385-86.) On July 6, 1999, Dr. Depaz noted that Plaintiff exhibited no pain behavior and on July 27, 1999 Plaintiff reported that his neck and back pain had improved and that physical therapy was also helping him.  (R. 378-79.)

An MRI taken of Plaintiff's lumbar spine on September 29, 1999 reflected no significant central canal stenosis at either L4-L5 or L5-S1.  (R. 375.)  Plaintiff reported to Dr. Depaz on a January 14, 2000 visit that a recent facet block injection had

improved his pain by 40 percent.  (R. 372.)  Dr. Depaz remarked on examination on that

visit that Plaintiff exhibited less pain posturing and that Plaintiff "is up and about with

less hesitation in motion and pain behaviors."  (*Id*.)  On May 16, 2000 Dr. Depaz noted

that Plaintiff's neck was much better and he wrote that "Mr. Hicks is doing better.  He

continues to have some neck and low back discomfort, but the neck pain is improved."

(R. 369.)  On August 17, 2000 Dr. Depaz noted that Plaintiff was consistently doing his

home exercise program and that "The patient appears to be doing better at this time.

He continues to gradually improve.  His neck pain has almost resolved, but his back

pain persists."  (R. 367.)

On October 17, 2000 Dr. Depaz completed a Permanent Impairment Report with

respect to Plaintiff.  (R. 365.)  He assigned Plaintiff a 10 percent whole person

impairment, apportioned for 4 percent for his myofascial/mechanical pain and 6 percent

for his C4-C5 protrusion.  (*Id*.)  The progress notes from Plaintiff's visit to Dr. Depaz on

the same day reflected that Plaintiff "states he is doing 'pretty good.'"  (R. 366.)

On another visit to Dr. Depaz on February 12, 2001, Plaintiff reported that the

nerve block injection he had recently been given in his left trapezius had helped him

quite a bit.  (R. 362.)  On examination Dr. Depaz noted that Plaintiff "is much improved

regarding the left trapezius area subsequent to the injection" and that Plaintiff had

shown "[e]xcellent response to [the] injection."  (*Id*.)  On May 7, 2001, Dr. Depaz noted

that Plaintiff was "Overall improved."  (R. 361.)  Another MRI of Plaintiff's cervical spine

taken on August 15, 2001 reflected "no significant change from the prior study of 07-02-

99."  (R. 382-83.)   On August 21, 2001, Plaintiff reported that his neck pain was getting

worse, but Dr. Depaz noted that there had been no change in Plaintiff's cervical spine

9

MRI.  (R. 380-81.)  On September 7, 2004, Dr. Depaz referred Plaintiff for psychological evaluation and treatment as well as for a comprehensive evaluation and treatment from a physical therapist.  (R. 466-67.)

Dr. Depaz completed a Residual Functional Capacity Evaluation By Treating Physician form that was provided to him by Plaintiff's counsel.  (R. 456-59.)  The form, dated September 20, 2004, asked Dr. Depaz to check a series of boxes to assess Plaintiff's RFC.  (*Id.*)  Dr. Depaz checked boxes indicating that Plaintiff can sit for up to 30 minutes at a time, stand for up to 30 minutes at one time, occasionally lift 5 to 9 pounds, and frequently lift 5 to 9 pounds.  (R. 456-58.)  He stated that Plaintiff could sit for a total of 4 to 5 hours per day at a job that allows him a five minute stretch break each hour and that Plaintiff could stand for a total of 3 to 4 hours per day at a job that allowed him to take a 5 minute break each hour to sit down or walk around.  (R. 456-57.)  He also opined that Plaintiff could work for 5 to 6 hours per day at a job with a sit/stand option.  (R. 457.)  When prompted to describe the objective medical evidence on which he based his answers, Dr. Depaz wrote that Plaintiff had "back surgery x4 as well as cervical DDD [degenerative disc disease] & chronic pain syndrome."  (R. 458.)

Dr. Depaz also completed a Clinical Assessment Of Pain by Treating Physician form that was also provided to him by Plaintiff's counsel.  (R. 460-65.)  The form, dated September 19, 2004, asked Dr. Depaz to check a series of boxes to assess Plaintiff's pain.  (*Id*.)  When asked how he would rate Plaintiff's pain based on a medical assessment of both the Plaintiff's subjective reporting and his own objective findings, Dr. Depaz checked the boxes corresponding to both moderate pain and marked pain.  (R. 462-63.)  He also checked boxes corresponding to mild restrictions in Plaintiff's

10

ability to (i) maintain attention and concentration for extended periods, (ii) interact appropriately with the general public, (iii) perform activities within a schedule, (iv) maintain regular attendance and (v) be punctual within customary tolerances.  (R. 464.) He also checked the box corresponding to moderate restrictions in Plaintiff's ability to (i) complete a normal workday and workweek without interruptions from pain and (ii) to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)

Physical therapist David Ochs completed a Functional Capacity Evaluation of Plaintiff on April 26, 2005.  (R. 472-76.)  Mr. Ochs concluded that Plaintiff appeared capable of work at a sedentary-light level but noted that he "would not expect the client to return to a fulltime work status."  (R. 473.)  Mr. Ochs did note, however, that Plaintiff gave a submaximal effort to some of the tasks that performed and also opined that Plaintiff "can do more at time than he currently states or perceives."  (R. 474-76.)

Plaintiff visited Dr. Christopher Leber, M.D. at Southeastern Rehabilitation Medicine on January 8, 2009 and noted that Plaintiff moved from sitting to standing with discomfort and that Plaintiff's gait was impaired.  (R. 514.)  On March 12, 2009, Plaintiff reported to Dr. Leber that he had tremors in both hands, which made it difficult to write. (R. 518.)  Dr. Leber noted that, when Plaintiff attempted to write, his right hand shook with a "non-pill rolling type of tremor that is worse with intention" and that the other hand had only a slight tremor.  (*Id*.)  On April 9, 2009 Dr. Leber noted that Plaintiff's tremor was not as pronounced as the previous visit.  (R. 520.)  On May 8, 2009, Plaintiff reported that he felt better and that he had a better outlook.  (R. 522.)  On August 5, 2009 Dr. Leber noted that Plaintiff "[s]till has some difficulty with cognitive issues" and

that Plaintiff "is able to ambulate independently."  (R. 528.)

> **2.     Physical RFC Assessments and Mental Status assessments**

In concluding that Plaintiff had experienced medical improvement, ALJ Garcia also relied upon several other physical and mental RFC assessments and examinations.

On November 20, 2001, Dr. Lance I. Chodosh, M.D. performed a consultative examination of Plaintiff.  (R. 391-95.)  He noted that Plaintiff exhibited "moderately severe pain behavior which limits cooperation and functional assessment."  (R. 392.) Plaintiff was able to squat and rise or walk on his heels or toes but his gait showed a nonspecific abnormality to pain.  (R. 393.)  Dr. Chodosh concluded that "[o]ther than a modest decrease in spinal mobility secondary to fusion, I could not verify objectively any back or spinal impairment other than what could be accounted for on the basis of behavior."  (R. 394.)  He opined that, although Plaintiff brought crutches with him to the appointment, Plaintiff did not require the use of an assistant device for ambulation.  (R. 393-94.)  He further opined that Plaintiff is able to see, hear, and speak normally; physically able to walk, stand and sit normally; able to bend to a moderate degree; able to lift and carry up to twenty-five pounds occasionally; probably able to squat and kneel but may have difficulty crawling; able to handle objects of moderate size and weight occasionally; able to travel; able to comprehend and follow directions; and probably able to relate normally to others.  (*Id.*)

Dr. Andres Nazario, Jr., Ph.D., a licensed psychologist, completed a consultative general clinical evaluation with mental status of Plaintiff on December 4, 2001.  (R. 396-

99.)  Dr. Nazario diagnosed Plaintiff with adjustment disorder with depressed mood, chronic, secondary to Plaintiff's experience of pain and a disabling condition.  (R. 398.) He also noted, however, that Plaintiff reported having found ways of coping and that Plaintiff did not see himself in need of mental health treatment.  (*Id.*)  Dr. Nazario also noted that Plaintiff was able to understand and follow directions, interact with others appropriately and was capable of managing his own finances.  (R. 399.)

On December 18, 2001 psychiatrist Dr. Alejandro F. Vergara, M.D. completed a Psychiatric Review Technique in which he noted that Plaintiff's impairments were non-severe.  (R. 400.) He also noted that Plaintiff's impairments had actually improved.  (*Id.*) He concluded that Plaintiff suffered from an adjustment disorder with depressed mood. (R. 403.)  Dr. Vergara concluded that Plaintiff had mild restrictions in (i) his activities of daily living, (ii) difficulties in maintaining concentration, persistence or pace, and (iii) difficulties in maintaining social functioning.  (R. 410.)

Dr. Nicholas Bancks, M.D. completed a Physical Residual Functional Capacity Assessment of Plaintiff dated December 27, 2001.  (R. 414-21.)  He concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight hour workday, sit for a total of six hours in an eight hour work day and unlimited push/pull limitations. (R. 415.)  On February 22, 2002 Dr. Tom Peele, M.D. completed a Physical Residual Functional Capacity Assessment with conclusions identical to those of Dr. Bancks.  (R. 436-43.)

**D.   Hearing Testimony**

At the administrative hearing Plaintiff testified that he experiences sharp pain in

13

his lower back, which causes him to get an average of three to four hours of sleep per night.  (R. 607.)  He was given a duragesic patch by Southeastern Rehabilitation Medicine and testified that this patch eliminates some, but not all, of his pain.  (*Id.*)

With respect to his physical limitations, Plaintiff testified that he can sit for twenty minutes and stand for twenty minutes.  (R. 609.)  After he sits or stands for twenty, he then lays down for about an hour.  (R. 610.)  He lays down up to seven times a day.  (R. 609.)  He testified that he can walk about six or seven blocks at a time.  (*Id.*)  Plaintiff walks with a cane, which he has used for about fifteen years, as well as a boot on his left foot.  (R. 613.)  Plaintiff also testified that he "always" experiences tremors in both hands, which prevent him from writing.  (R. 615.)

With respect to his psychological symptoms, Plaintiff testified he cannot think correctly and this feeling sometimes lasts for two to three hours.  (R. 608.)   He also experiences depression, for which he has received medication.  (R. 607, 610.)  Plaintiff testified that he isolates himself and that "I've gotten to the point to where it doesn't matter if I live or not."  (R. 610.)  He said he feels this way all of the time.  (*Id.*)  Plaintiff also testified he is frequently angry because he sees older people that can do things that he cannot, like jogging, walking fast or playing basketball.  (R. 611.)

Plaintiff further testified that his ability to concentrate is very poor.  (R. 611.)  He stated that he frequently loses his train of thought and that he has trouble remembering things.  (*Id.*)  He testified that "I guess I just can't put things together like everybody else, you know, it's just harder for me now, and I think that's coming from the - - just being depressed, and just got over - - and happened to my life."  (R. 614.)

14

With respect to his daily activities, the Plaintiff testified he attempts to help his wife with the cooking, but he frequently has to sit down and rest.  (R. 612.)  He also tries to do the laundry but his wife has to fold the clothes.  (*Id.*)  He is only able to spend fifteen minutes doing household chores due to the pain in his lower back.  (R. 614.)  He can lift five pounds but no more than twice a week.  (R. 615.)  According to Plaintiff, he goes to the grocery store with his family but cannot grocery shop alone.  (R. 615-16.)

With respect to his social functioning, Plaintiff stated that he does little socializing aside from talking to his family "on and off."  (R. 613.)  He explained: "I actually really don't know anything to say to them when they're talking about things about what they can do, and what they do, and I hear them talking about how much [fun] they're having and that depresses me."  (R. 613-14.)

Upon examination by the ALJ, Plaintiff testified that he and his wife were rear-ended in a car on their way to the movies in 2004.  (R. 617.)  The ALJ asked Plaintiff whether he could sit through a two hour movie, and Plaintiff responded that he cannot but nonetheless goes to the movies with his wife to make her happy.  (R. 617-18.)  The ALJ noted that Plaintiff had reported at his last administrative hearing in September 2004 that he could walk about 100 yards.  (R. 618.)  The ALJ asked whether Plaintiff's ability to walk had changed since then and Plaintiff responded that he could now walk about six blocks.  (*Id.*)

Susanna Roche, a Vocational Expert ("VE"), also testified at the hearing.  ALJ Garcia described a hypothetical individual who was age 49, has a twelfth grade education, and the same work experience as Plaintiff.  The hypothetical also included an individual who can only sit for thirty minutes at a time for a total of four to five hours

15

per day with a five minute stretch break each hour; can stand for thirty minutes at a time

for a total of three to four hours per day; can sit or stand at will a total of five to six hours

per day; lift five to nine pounds frequently; with a mild ability to maintain concentration

for extended periods of more than five to ten minutes at a time; the mild ability to

perform activities within a schedule, maintain regular attendance and be punctual within

customary tolerance; a mild ability to interact appropriately with peers or the public; and

a moderate ability to complete a normal work day and work week without interruption

from pain and to perform at a consistent base without a reasonable number of rest

periods.[16]  (R. 626-27.)  The VE testified that the hypothetical individual described by

the ALJ would not be able to perform any of Plaintiff's past relevant work.  (R. 627.)

The VE further testified that there are no jobs in the national economy at the unskilled

level that such a person would be able to perform in which the individual could alternate

standing and sitting positions. (*Id.*)   Finally she also testified that there are no jobs in

the national economy at the unskilled, light level that such an individual could perform.

(*Id.*)

The ALJ then presented the VE with a second hypothetical.  The second

hypothetical individual described an individual who could occasionally lift and/or carry

twenty pounds and frequently lift and/or carry 10 pounds, stand/walk/sit for six hours in

an eight hour workday, push/pull unlimited, no climbing of ladders/ropes/scaffolding,

never balancing, stooping and crouching occasionally, avoid concentrated exposure to

---

[16] The ALJ defined "mild" as the "patient's ability to function in this area is limited, but not precluded." (R. 627.) He defined "moderate" as "the ability to function in this area is seriously limited." (R. 627.)

hazards like dangerous machinery and unprotected heights.  (R. 627-28.)  The VE

opined that the second hypothetical individual described by the ALJ could perform

Plaintiff's past relevant work as a central supply worker and a surgical technician, as

performed in the national economy, but not as stated by the Plaintiff at the

administrative hearing.  (R. 628.)

### E.    Findings of ALJ Garcia

In his decision ALJ Garcia noted that ALJ Tannenbaum had concluded that

Plaintiff, at the time of the CPD, had the medically determinable impairments of failed

back syndrome, chronic pain syndrome, and major depression.  (R. 505.)  ALJ Garcia

further noted that ALJ Tannenbaum determined that Plaintiff's impairments resulted in

Plaintiff having the RFC to perform only minimal work functions, such that he was

unable to perform any type of work on a regular and continuing basis.  (*Id*.)  ALJ Garcia

also found that Plaintiff had not engaged in substantial gainful activity since January 1,

2002, the date that Plaintiff's disability ended.  (*Id*.)

ALJ Garcia concluded that the medical evidence established that, as of January

1, 2002, Plaintiff had the following medically determinable impairments: failed back

syndrome, chronic pain syndrome, and a C4-C5 disc protrusion with

myofascial/mechanical pain.  (*Id*.)  He concluded that since January 1, 2002 Plaintiff did

not have an impairment or combination of impairments that met or equaled the Listings.

(*Id*.)  He concluded that medical improvement had occurred as of January 1, 2002.  (R.

506.)  ALJ Garcia went on to conclude that, as of January 1, 2002, the impairments

present at the time of the CPD had decreased in medical severity to the point where

Plaintiff had the RFC to: lift and carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk for 6 hours in an 8 hour day; use his upper and lower extremities for pushing and pulling; had to avoid ladders, ropes, scaffolds and concentrated exposure to hazards such as dangerous machinery and unprotected heights; and that Plaintiff was able to balance, stoop and crouch occasionally.  (R. 508.)

ALJ Garcia also came to the conclusion that Plaintiff's medical improvement was related to his ability to work because it resulted in an increase in his RFC.  (R. 509.) ALJ Garcia concluded that Plainitff possessed the RFC to perform light work except that he had to avoid climbing ladders, ropes and scaffolds, that he was able to balance, stoop and crouch occasionally, and that he needed to avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights.  (R. 509.) Accordingly, ALJ Garcia concluded that, as of January 1, 2002, Plaintiff had been capable of performing his past relevant work as a central supply technician and a surgical technician.  (R. 511.)  The ALJ further noted that neither of these jobs required the performance of work-related activities that would be precluded by Plaintiff's RFC based on the impairments present as of January 1, 2002.  He thus concluded that Plaintiff's disability ceased as of January 1, 2002.  (R. 511-12.)  ALJ Garcia also made an alternative Step Eight finding that Plaintiff would have been able to perform other work existing in significant numbers in the national economy pursuant to Medical-Vocational Rule 202.21 even if he could not perform his past relevant work.  (*Id.*)

## IV. <u>DISCUSSION</u>

Plaintiff argues that ALJ Garcia failed to comply with a previous order of this

18

Court instructing ALJ Garcia to (i) give greater weight to Dr. Depaz's opinion as well as (ii) elicit the testimony of a VE based on Dr. Depaz's opinion.  Although Plaintiff groups these errors together under a single heading in his memorandum,[17] the Court will address them separately below.

### A.   ALJ Garcia's Treatment of Dr. Depaz's Treating Physician Opinion

Plaintiff contends that ALJ Garcia did not comply with a prior order of this Court in Case No. 1:07-cv-143-MP-AK remanding that case to the Commissioner to, among other things, give greater weight to the medical opinions expressed by treating physician Dr. Oscar Depaz.  (1:07-cv-143-MP-AK Doc. 24 at 19-21; R. 566-68.)  On remand ALJ Garcia properly considered Dr. Depaz's medical opinion as expressed in the doctor's 2001 progress notes.  In addition, the ALJ's decision to accord limited weight to the medical opinion expressed in a 2004 RFC assessment by Dr. Depaz was supported by substantial evidence in the record, including Dr. Depaz's own 2001 progress notes.

In this Court's Report and Recommendation in Case No. 1:07-cv-143-MP-AK remand was recommended not solely because of ALJ Romo's treatment of Dr. Depaz's treating physician opinion. Rather the case was remanded because: (1) ALJ Romo did not elicit the testimony of a VE; (2) the record actually supported Plaintiff's subjective

---

[17] The sole grounds for error asserted by Plaintiff in his memorandum is that ALJ Garcia "failed to comply with this Courts [sic] Order Adopting Magistrate Judge Kornblum's Report and Recommendations Directing the ALJ to give greater weight to the opinion of Dr. Depaz, Plaintiff's treating physician, and then illicit [sic] the testimony of the Vocational Expert."  (Doc. 22 pp. 1, 6.)

allegations of pain and mental limitation despite ALJ Romo's conclusion otherwise;[18]

and (3) ALJ Romo failed to give greater weight to the Dr. Depaz's records and opinions.

Specifically, with respect to the ALJ's treatment of the medical opinions

expressed by Dr. Depaz this Court observed:

> "Also, the ALJ gives greater weight to the consultative examiners because
> their opinions are based on objective clinical findings and are consistent
> with the medical record in its entirety.  While this might support a rejection
> of Dr. Depaz's functional assessment, since there is no corresponding
> treatment note to support the assessment dated September 19, 2004,
> there is no basis for rejecting Dr. Depaz' opinion at the time of the
> consultative examinations in 2001.  At this time, Plaintiff was seeking
> ongoing treatment from Dr. Depaz, the records include treatment history
> and objective findings, and therefore, there is no basis for giving greater
> weight to their reports over Dr. DePaz as to Plaintiff's medical condition in
> late 2001.  Since the ALJ's determination is that the disability ceased on
> January 1, 2002, and Dr. Depaz was the only physician of record at this
> time, his records and opinions should have been given greater weight for
> this decision."

(Case No. 1:07-cv-143-MP-AK. Doc. 24 at 19-20; R. 567-68.

There are two medical sources in the record from Dr. Depaz - the 2004 form he

filled out and the progress notes and treatment records from 2001.  When the case was

remanded by this Court the ALJ was directed to give appropriate weight to the medical

evidence, progress notes and treatment records from 2001 because that was during the

time period shortly before the disability allegedly ended.  While the Court did not specify

the weight to be given the 2004 form filled out by Dr. Depaz the Court expressly stated

---

[18] Notably, in this case Plaintiff does not raise the issue of his mental impairments. The medical
evidence in the record demonstrates that by January 1, 2002 Plaintiff's previous mental health issues had
abated. For example, Plaintiff reported to Dr. Nazario that he had found ways of coping with his
impairments and that he did not see himself in need of mental health treatment.  (R. 398.)  Similarly, Dr.
Vergara noted on the Psychiatric Review Technique that Plaintiff's mental impairments had improved.  (R.
400.)  Accordingly, Plaintiff did not possess any significant non-exertional impairments that would have
precluded the use of the Grids by ALJ Garcia in his alternative Step Eight finding, and the use of the Grids
by ALJ Garcia was proper in that respect.  (R. 510-11.)

"While this [i.e. no contemporaneous medical records] might support a rejection of Dr.

Depaz's functional assessment, since there is no corresponding treatment note to

support the assessment dated September 19, 2004, there is no basis for rejecting Dr.

Depaz's opinion at the time of the consultative examinations in 2001." Simply put, the

ALJ was directed to give due consideration to Dr. Depaz's medical records and

progress notes during the time period he treated the Plaintiff. That is exactly what ALJ

Garcia did in his decision in this case.

ALJ Garcia concluded in his decision that:

> Regarding the opinion evidence, the undersigned has considered
> medical source statements completed by Dr. De Paz in 2004 and 2007.
> Dr. De Paz opined that the claimant would be unable to complete a
> normal workday and workweek without interruptions from pain. He
> further opined that the claimant would be unable to tolerate light work
> functions unless he were allowed to alternate standing and sitting at will
> (Exhibit 70).  Dr. De Paz's opinion is given limited weight, as it was
> written two years after the date at issue (January 1, 2002), and it is not
> supported by either his own records or by the evidence as a whole.
> Furthermore, it must be noted that even though Dr. De Paz has a
> treatment history with the claimant, there are no medical records in the
> file from Dr. De Paz since August 2001, except for a referral to physical
> therapy and for a psychological evaluation in September 2004 (Exhibit
> 57).

(R. 509.)  ALJ Garcia then discounted Dr. Depaz's 2004 medical opinion in favor of the

opinions expressed by Dr. Chodosh and the two state agency consulting physicians

who had concluded that Plaintiff could perform light work.[19]  (*Id*.)  The ALJ noted that

the opinions expressed by Dr. Chodosh and the two examining state agency consulting

---

[19] ALJ Garcia concluded that: "By contrast, great weight is given to the opinion of Dr. Chodosh
(Exhibit 58).  Dr. Chodosh's opinion is consistent with his examination findings and with other medical
evidence, including the opinions of the two state agency consulting physicians who reviewed the record in
2002.  Both reviewing physicians also opined that the claimant retained the ability to do light work.
(Exhibits 61 and 63).  Their opinions are also given significant weight, because they are congruent with
other evidence and with each other."  (R. 509.)

physicians were consistent both with Dr. Chodosh's examination findings as well as the other medical evidence in the record. (*Id*.)

ALJ Garcia's rejection of Dr. Depaz's 2004 opinion was correct because as this Court recognized in the previous Report and Recommendation, the 2004 opinion was not based on any contemporaneous (or even recent) examinations of Plaintiff and therefore "there [wa]s no corresponding treatment note to support the assessment dated September 19, 2004." Therefore, consistent with the Court's directive ALJ Garcia discounted the 2004 assessment and accorded appropriate weight to the progress notes from Plaintiff's visits to Dr. Depaz between 1999 and 2001 as support for his conclusion rejecting the 2004 from filled-out by Dr. Depaz.

Dr. Depaz's treatment notes between 1999 and 2001 reflect that Plaintiff was improving steadily and that Plaintiff's pain was decreasing. For example, Dr. Depaz only gave Plaintiff a 10 percent[20] whole person impairment rating in his October 17, 2000 Permanent Impairment Report for Plaintiff. (R. 365.) Additionally, the progress notes from Plaintiff's last visit with Dr. Depaz on August 21, 2001, reflect that there were no changes detected in a recent MRI scan of Plaintiff's cervical spine compared to the MRI taken in July 1999. (R. 380-83.) Moreover, Dr. Depaz's progress notes from August 2000, October 2000 and May 2001 all reflect that Plaintiff was improving (R. 361, 365, 367), a finding which significantly contrasts with the assessment of Dr. Depaz in 2004 on the form he filled-out.

ALJ Garcia's decision to attribute limited weight to Dr. Depaz's 2004 RFC opinion

---

[20] This 10 percent whole person impairment figure was apportioned as 4 percent for Plaintiff's myofascial/mechanical pain and 6 percent for his C4-C5 protrusion. (R. 365.)

is also supported by other medical evidence in the record.  As ALJ Garcia noted, his conclusion with respect to the weight he gave Dr. Depaz's 2004 RFC opinion was consistent with the opinion of Dr. Chodosh as well as the physical RFC reports completed by state agency consulting physicians Drs. Peele and Bancks.  (R. 391-95, 414-21, 436-43, 509.)  David Ochs, a physical therapist, also concluded in his own RFC evaluation of Plaintiff in 2005 that Plaintiff could perform at the sedentary-light level.  (R. 473, 476.)  In addition, Dr. Christopher Leber noted in August 2009 that Plaintiff "is able to ambulate independently."  (R. 528.)  Dr. Gary Lowery examined Plaintiff on November 2, 1998 and noted that Plaintiff's symptomatology was all improving and that Plaintiff's activity tolerance had increased.  (R. 390.)   An examination by Dr. James Berk in August 2004 reflected that Plaintiff was in no acute distress and that Dr. Berk had little to offer Plaintiff in the way of further treatment.  (R. 468-69.)

The opinions of treating physicians "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."[21]  The Eleventh Circuit has stated that such "good cause" exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."[22]  When an ALJ elects to disregard a treating physician's opinion, he must clearly articulate his reasons for doing so.[23] ALJ Garcia's evaluation of Dr. Depaz's opinions was entirely consistent with this standard.

---

[21] Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

[22] Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

[23] Id.

In sum, ALJ Garcia's treatment of Dr. Depaz's opinion, as expressed in the 2004 RFC assessment form, was entirely proper.  Based upon the inconsistency between Dr. Depaz's 2001 progress notes and his medical opinion in the 2004 RFC assessment, as well as the inconsistency between the weight of the rest of the medical evidence and Dr. Depaz's opinion in the 2004 RFC assessment, the Court concludes that ALJ Garcia did not err in according limited weight to the opinion of Dr. Depaz as expressed in the 2004 RFC assessment.  Where, as here, an ALJ has made a clearly articulated finding based upon substantial evidence in the record, a reviewing court should not disturb the findings by the ALJ.

**B.**    **Plaintiff's RFC and The Hypothetical Posed By ALJ Garcia To The VE**

Plaintiff also contends that ALJ Garcia did not comply with this Court's order in Case No. 1:07-cv-143-MP-AK instructing the Commissioner to elicit the testimony of a VE on remand.  (1:07-cv-143-MP-AK Doc. 24 at 15-16; R. 563-64.)  Contrary to Plaintiff's suggestion, ALJ Garcia utilized a VE at the administrative hearing and then presented two hypothetical questions to the VE, the second of which corresponded to Plaintiff's RFC.  Plaintiff argues that ALJ Garcia erred in rejecting the first hypothetical question -- which corresponded to Dr. Depaz's medical opinion –  and instead relying upon the second hypothetical, which was based upon a vocational profile consistent with the RFC finding by the ALJ.

The testimony of a VE constitutes substantial evidence upon which an ALJ may properly rely where the testimony is elicited in response to a hypothetical that

"accurately portray[s] the claimant's individual physical and mental limitations."[24] The hypothetical need only include such limitations as are supported by the record.[25]

At the administrative hearing, ALJ Garcia described a hypothetical individual with the following profile: age 49; a twelfth grade education; with the same work experience as Plaintiff.  The ALJ then utilized two hypothetical questions.  The first hypothetical individual possessed the vocational profile that Dr. Depaz's medical opinion reflected for Plaintiff.  (R. 626-27.)  The second hypothetical individual could occasionally lift and/or carry twenty pounds and frequently lift and/or carry 10 pounds, stand/walk/sit for six hours in an eight hour workday, push/pull unlimited, no climbing of ladders/ropes/scaffolding, never balancing, stooping and crouching occasionally, avoid concentrated exposure to hazards like dangerous machinery and unprotected heights. (R. 627-28.)

After posing the two hypothetical questions to the VE, ALJ Garcia concluded that Plaintiff possessed the RFC to lift and carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk for 6 hours in an 8 hour day; able to use his upper and lower extremities for pushing and pulling; had to avoid ladders, ropes, scaffolds and concentrated exposure to hazards such as dangerous machinery and unprotected heights; and that Plaintiff was able to balance, stoop and crouch occasionally.  (R. 508.) The VE opined that the second hypothetical individual could perform Plaintiff's past relevant work as a central supply worker and as a surgical technician, as performed in

---

[24] *See* Schonewolf v. Callahan, 972 F. Supp. 277, 289 (D.N.J. 1997); Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997).

[25] *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

25

the national economy, but not as stated by the Plaintiff at the administrative hearing. (R. 628.)  ALJ Garcia used the VE's testimony to compare his RFC finding to Plaintiff's past relevant work and determined that Plaintiff was able to perform his past relevant work as a central supply worker and a surgical technician.  (R. 511.)

ALJ Garcia's conclusion with respect to Plaintiff's RFC was supported by substantial evidence.  Indeed, much of the same evidence that supported the ALJ's conclusion to give limited weight to Dr. Depaz's medical opinion in the 2004 RFC assessment also supported his conclusion with respect to Plaintiff's RFC.

For instance, ALJ Garcia's conclusion with respect to Plaintiff's RFC was consistent with the opinion of examining physician Dr. Chodosh and the physical RFC reports completed by state agency consulting physicians Drs. Peele and Bancks.  (R. 391-95, 414-21, 436-43, 509.)  Dr. Chodosh opined that Plaintiff is able to see, hear, and speak normally; physically able to walk, stand and sit normally; able to bend to a moderate degree; able to lift and carry up to twenty-five pounds occasionally; probably able to squat and kneel but may have difficulty crawling; able to handle objects of moderate size and weight occasionally; able to travel; able to comprehend and follow directions; and probably able to relate normally to others.  (R. 393-94.)  Drs. Bancks and Peele each concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight hour workday, sit for a total of six hours in an eight hour work day and unlimited push/pull limitations.  (R. 414-21, 436-43.)  ALJ Garcia's conclusion with respect to Plaintiff's RFC was also consistent with the opinion expressed by physical therapist David Ochs, who concluded that Plaintiff appeared capable of work at a sedentary-light

26

level.  (R. 473.)

Because ALJ Garcia's assessment of Plaintiff's RFC was supported by substantial evidence, as long as he used this RFC in his hypothetical the opinion of the VE constitutes substantial evidence.   ALJ Garcia presented the VE with a second hypothetical of an individual who could occasionally lift and/or carry twenty pounds and frequently lift and/or carry 10 pounds, stand/walk/sit for six hours in an eight hour workday, push/pull unlimited, no climbing of ladders/ropes/scaffolding, never balancing, stooping and crouching occasionally, avoid concentrated exposure to hazards like dangerous machinery and unprotected heights.  (R. 627-28.)  This hypothetical corresponds to Plaintiff's RFC as determined by ALJ Garcia.  Accordingly, this second hypothetical was proper because it included all of Plaintiff's limitations.

Alternatively, even assuming *arguendo* , that ALJ Garcia erred in adopting the second hypothetical he posed to the VE, the error was harmless because ALJ Garcia made an alternative Step Eight finding. The ALJ found, even if Plaintiff could not have returned to his past relevant work as of January 1, 2002, Plaintiff would have been able to perform other work existing in significant numbers in the national economy pursuant to Medical-Vocational Rule 202.21.  (R. 511.)  In support of this conclusion, the ALJ noted that as of January 1, 2002 Plaintiff was a younger individual with a high school education and that "Plaintiff's minimal postural and environmental limitations did not significantly erode the occupational base for unskilled light work."  (R. 511-12.)  As such application of the Grids would have supported the ALJ's decision even if Plaintiff could not perform his past relevant work.

In sum, ALJ Garcia complied with this Court's prior order in Case No. 1:07-cv-

27

143-MP-AK in eliciting the testimony of a VE at Plaintiff's administrative hearing.  He

also followed the correct analytical steps in formulating a hypothetical question that

included all of Plaintiff's limitations that were supported by the medical evidence in the

record.  Furthermore, the limitations expressed in the second hypothetical question

were supported by substantial evidence.  Accordingly, the ALJ did not err in concluding

that Plaintiff's disability ended as of January 1, 2002

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on August 4, 2011.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**